# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**LAURA SHERMAN**

**CIVIL ACTION**

**VERSUS**

**NO. 23-442-JWD-RLB**

**LOUISIANA WORKERS'
COMPENSATION CORPORATION**

## RULING AND ORDER

This matter comes before the Court on the *Motion for Summary Judgment* (Doc. 10) filed by the Louisiana Workers' Compensation Corporation ("Defendant" or "LWCC"). Plaintiff Laura Sherman ("Plaintiff" or "Sherman") opposes the motion. (Doc. 19.) LWCC has filed a reply, (Doc. 22), and Sherman has filed a surreply, (Doc. 25). Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendant's motion is denied.

## I. RELEVANT FACTUAL BACKGROUND

LWCC is Louisiana's largest workers' compensation carrier, providing coverage to thousands of policyholders in the state. (*Def.'s Stat. of Undisputed Material Facts* ("*DSUMF*") ¶ 1, Doc. 10-6; *Pl.'s Resp. to [DSUMF]* ("*PRSUMF*") ¶ 1, Doc. 19-2.)[1] Plaintiff began working with LWCC in November 1993; she started in the claims department, was promoted several times over the next several years, and was ultimately transferred to LWCC's underwriting department, where she stayed for the remainder of her employment, serving finally as a Senior Special Risk Underwriter. (*DSUMF* ¶¶ 10–13, Doc. 10-6.)

---

[1] Hereafter, when the *DSUMF* is cited alone, that fact has either been admitted in the *PRSUMF* or been qualified or denied in such a way as to have it be deemed admitted as not properly controverted. *See* M.D. La. Civ. R. 56(c), (f).

In this case, Plaintiff claims she was discriminated against by LWCC in violation of 42 U.S.C. § 1981 when she was terminated for sending personal emails with her LWCC email account and for failing to report her ownership of rental property as outside "employment." (*Compl.* ¶ 37, Doc. 1.) Plaintiff alleges that both reasons for termination served as a pretext for racial discrimination. (*Id.*)

The incident giving rise to this case occurred on June 8, 2022. According to Plaintiff, at 11:00 a.m. on that day, she was in a LWCC conference room making a personal zoom call regarding her investment property. (Sherman Decl. ¶ 9, Doc. 19-8.) At 11:33 a.m., Ms. Angela McGhee entered the room, demanded to know what Sherman was doing, and said that McGhee had reserved the room. (*Id.*; Sherman Dep. 74, Doc. 10-2.) However, according to Plaintiff, Sherman properly reserved the conference room. (*Id.*) In any event, McGhee said she was going to report the incident to the CEO, Kristin Wall, and Sherman said that she was discussing personal business with the Louisiana Housing Corporation regarding a grant request she had made for one of her rental properties. (Sherman Decl. ¶ 9, Doc. 19-8; *DSUMF* ¶ 38, Doc. 19-8.) Plaintiff testified that she made the call on her lunch break. (Sherman Dep. 74, Doc. 10-2.)

LWCC vice presidents McGhee, Kyle Rickards, and Jamie Bourg attest that they conducted an investigation and determined that Sherman was actively working on her rental properties without permission to engage in outside work, as required by LWCC's Outside Employment Policy. (McGhee Decl. ¶ 11, Doc. 10-3; Bourg Decl. ¶ 9, Doc. 10-4; Rickards Decl. ¶ 8, Doc. 10-5.) They also say they determined she violated the Unethical Behavior Policy by misusing corporate resources for her personal business. (*Id.*) All three LWCC Veeps aver that they decided to terminate Sherman based on these findings. (McGhee Decl. ¶ 11, Doc. 10-3; Bourg Decl. ¶ 9, Doc. 10-4; Rickards Decl. ¶ 8, Doc. 10-5.)

2

Both sides offer evidence about these policies. LWCC submits in evidence the language of the Outside Employment and Unethical Behavior Policies as well as testimony about their meaning. (Sherman Dep., Ex. 4–5, Doc. 10-2 at 68–69; Bourg Decl. ¶ 4, Doc. 10-4). Conversely, Plaintiff submits a number of declarations from former employees of the LWCC touching on how these policies were generally understood, applied, and enforced in practice; whether they applied to investment property; whether LWCC had knowledge of Plaintiff's activities with the investment property; what employees were allowed to do during breaks; and whether any other employee had ever been terminated for violating either policy. Plaintiff also provides her own declaration addressing these issues and the June 8, 2022, incident. The Court will address this evidence below.

## II.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden and must identify 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted)).

If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations,

by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted).

Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (cleaned up). Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (internal citations omitted).

## III.  DISCUSSION

### A.  General Law Governing § 1981

42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." Thus, "Section 1981 prohibits racial discrimination in making and enforcing contracts." *White Glove Staffing, Inc. v. Methodist Hosps. of Dall.*, 947 F.3d 301, 308 (5th Cir. 2020) (citing 42 U.S.C. § 1981). "For purposes of this section, the term 'make and enforce contracts' includes the . . . termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

"[T]he Fifth Circuit has held that '[w]hen used as parallel causes of action, Title VII and section 1981 require the same proof to establish liability.'" *Lambert v. City of McComb*, No. 19-141, 2021 WL 6803718, at *5 (S.D. Miss. Mar. 12, 2021) (quoting *Shackelford v. Deloitte &*

*Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir. 1999)). "In adjudicating Title VII claims for racial discrimination, as well as claims brought under 42 U.S.C. §§ 1981 . . . , the Fifth Circuit applies the same burden-shifting framework." *Id.* (citing *Giles v. City of Dallas*, 539 F. App'x 537, 543 (5th Cir. 2013)).

Title VII prohibits discrimination by employers "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). "Intentional discrimination under Title VII can be proven by either direct or circumstantial evidence." *Santos v. Baton Rouge Water Works Co.*, No. 18-1098, 2021 WL 1227875, at *15 (M.D. La. Mar. 31, 2021) (deGravelles, J.) (citing *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000)). "For evidence to be 'direct,' it must, if credible, prove the fact in question without inference or presumption." *Santos*, 2021 WL 1227875, at *15 (citing *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003) (citations omitted)). In situations like the case at bar, where a plaintiff has not presented any direct evidence of discrimination, "the Court shall employ the familiar burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 [ ] (1973)." *Id.*; *see also Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1984) (stating, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination").

The burden-shifting framework requires Plaintiff to first establish, by a preponderance of the evidence, a *prima facie* case of discrimination. *Santos*, 2021 WL 1227875, at *15 (citing *McDonnell Douglas*, 411 U.S. at 801–03). "A prima facie case is established once the plaintiff has proven that [s]he: (1) is a member of a protected class; (2) was qualified for [the] position [she sought]; (3) was subjected to an adverse employment action; and (4) was replaced by someone

5

outside the protected class; or in the case of disparate treatment, show that others similarly situated were treated more favorably." *Id.*; *see also Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005). If established, the *prima facie* case "raises a presumption of discrimination," and the burden then shifts to the defendant to rebut that presumption "by articulating a legitimate, nondiscriminatory reason for its actions." *Santos*, 2021 WL 1227875, at *15 (citing *McDonnell Douglas*, 411 U.S. at 802) (citations omitted). "The burden on the employer at this stage is one of production, not persuasion; it can involve no credibility assessment." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (cleaned up)).

Once the defendant satisfies their burden by proffering a non-discriminatory reason for the adverse employment action, "the *prima facie* case is dissolved, and the burden shifts back to the plaintiff" to create a genuine issue of material fact that either: (1) the defendant's "proffered reason is not true[,] but is instead a pretext for discrimination;" or (2) the defendant's "reason, while true, is not the only reason for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Id.* (citing *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)); *see also Santos*, 2021 WL 1227875, at *15 (describing the plaintiff's options as either proceeding under the "pretext alternative" or the "mixed-motives alternative") (citations omitted). Throughout the shifting back and forth of "intermediate evidentiary burdens" under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143 (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

### B. Parties' Arguments

LWCC argues that, even if Sherman could establish a *prima facie* case, LWCC has put forward evidence of a legitimate, nondiscriminatory reason for terminating Plaintiff. (Doc. 10-1 at 11–12.) LWCC maintains that the Fifth Circuit has held that a violation of company policy is a legitimate, nondiscriminatory reason, so the only issue before the Court is whether LWCC's justification is a pretext for unlawful race discrimination. (*Id.* at 12.) But, according to LWCC, Sherman cannot do this because she admits to the underling facts upon which the decision to terminate was made. (*Id.*) LWCC highlights the incident in the conference room which lead to the firing and the investigation the company did into Plaintiff's work on rental properties on her company computer. (*Id.*) Defendant also emphasizes how Sherman admitted to being aware about the Outside Employment Policy and how she knew of no other employee who violated it. (*Id.* at 13.) And while other employees had investment properties, she knew of no other employe who engaged in the kind of conduct she engaged in. (*Id.* at 13–14.) Ultimately, a plaintiff's subjective beliefs do not control; what matters is whether the employer reasonably believed its nondiscriminatory reason and acted on that basis. (*Id.* at 14.) That is, employers can be unreasonable, as long as they did not act with a discriminatory animus. (*Id.*)

Plaintiff responds first by arguing that Defendant has conceded that she made a *prima facie* case, and this creates a "strong presumption of discrimination. . . ." (Doc. 19-1 at 7.) Plaintiff then discusses the elements of her *prima facie* case, including that her duties within LWCC's Underwriting Department were assigned to a white male. (*Id.* at 7–12.) Plaintiff next argues that there are disputed facts on whether the policies were violated and whether they were consistently applied. (*Id.* at 12–13.) For instance, Sherman attests that she had received permission for outside work, and her use of company resources was incidental and not willful. (*Id.* at 13.) Other

employees, who were not members of the protected class, also engaged in similar behavior without facing termination. (*Id.*) Plaintiff points to other evidence supporting the idea that the secondary employment policy was not intended for personal investment properties. (*Id.* at 14.) Defendant's reasons are post-hoc rationalizations, and Defendant provided Sherman with no reason at the time of termination. (*Id.* at 14–16.) Further, LWCC's offered reasons are vague and inconsistent. (*Id.* at 17–19.) For all these reasons, Plaintiff urges that the Court deny Defendant's motion.

Defendant replies first by disputing some of Plaintiff's evidentiary assertions as "completely fabricated and lacking in any evidentiary support." (Doc. 22 at 1–2.) Defendant also says that Plaintiff's own deposition testimony conflicts with her assessment; for example, Plaintiff testified that only former LWCC employee Debra Taylor knew of her investment properties. (*Id.*) In any event, Plaintiff misses the mark because the issue isn't her passive ownership in rental properties; it's her actively working on those properties, which LWCC was not aware of until June 8, 2022. (*Id.* at 2–3.)

Defendant then advances that Plaintiff's *prima facie* case analysis is irrelevant, as Defendant assumed *arguendo* that this burden was met. (*Id.* at 3.) The key is whether Plaintiff can meet the ultimate burden of showing pretext. (*Id.* at 4.) Plaintiff cannot do this because she admitted in her deposition that she never submitted in writing that she had investment property and because Plaintiff's evidence of inconsistent application either fails to involve similar conduct or only negates any discrimination based on race. (*Id.* at 5.) For example, Stephen Cherry and Chantel Johnson are both Black, and they were allowed to work in secondary employment. (*Id.* at 5–6.) Plaintiff has insufficient evidence of white employees working outside employment, and the limited evidence she does have in her declaration contradicts her deposition testimony. (*Id.* at 6 (*comparing* Sherman Decl. ¶¶ 11, 15, Doc. 19-8, *with* Sherman Dep. 148–49, Doc. 22-1).)

Defendant then shows how the other declarations Plaintiff relies upon are inadequate. (*Id.* at 7–8.) Again, subjective beliefs, even of witnesses, do not establish what the policy should mean, and employers can make unreasonable termination decisions as long as they are not discriminatory. (*Id.* at 8–9.) Plaintiff's argument that the justification was a "post-hoc rationalization" defies her deposition testimony and declaration. (*Id.* at 9.) Likewise, Defendant's reasons were not inconsistent; her termination was not for performance issues but rather for violating LWCC's two policies. (*Id.* at 10.)

In surreply, Plaintiff begins by stating that LWCC's policy only applies to secondary "employment," not passive ownership of investment property. (Doc. 25 at 1.) Plaintiff maintains that there is a question of fact about whether Sherman violated that policy. (*Id.* at 2.) Equally clear, no non-minority employees were terminated for violating the secondary employment policy, and some non-minorities were allowed to do personal work on company time and use company email without being fired. (*Id.*) The sham affidavit rule cannot apply, as Sherman's declaration supplements her deposition testimony rather than contradicts it. (*Id.* at 3–4.) Specifically, she testified that she verbally reported her ownership interest in investment properties to Debra Taylor, the Human Resources manager, and that is consistent with her statement by declaration that managers and management staff were aware of her ownership. (*Id.*) Again, whether Plaintiff worked on investment property "during normal work hours" is also a question of fact, since the incident occurred during her lunch break. (*Id.* at 4.) Finally, the *prima facie* case can play a role in the pretext analysis. (*Id.* at 4–5.)

### C. Law and Analysis

#### 1. *Legitimate, Non-Discriminatory Reasons for Termination*

Preliminarily, a termination for violating company policies is a legitimate, non-discriminatory reason for termination. *See Holmes v. Thomson Reuters (Tax & Acct.) Inc.*, No. 22-10133, 2023 WL 2823897, at *2 (5th Cir. Apr. 7, 2023) (per curiam). Here, Defendant has produced such evidence.

Specifically, Defendants have provided the Outside Employment Policy itself, which provides:

OUTSIDE EMPLOYMENT

> It is the policy of the Corporation not to recommend or encourage full-time employees to hold other jobs. However, in certain circumstances, outside employment may be acceptable. Employees seeking outside employment must seek approval from the human resources department. Requests for permission to engage in outside employment will be considered as set forth below.

> Outside employment by full-time employees is not permitted without prior approval of the employee's department manager and the human resources department. An employee who seeks permission for outside employment should do so in writing to their department manager, setting forth the name and address of the prospective employer, the nature of the job, expected hours, and other pertinent information. The department manager will communicate the request to human resources for consideration. Human resources will communicate the resulting decision to all parties.

> Under no circumstances will the Corporation approve outside employment that presents a possible conflict of interest. Examples include working for a competitor or someone with whom the Corporation has a contractual relationship (e.g., a vendor, supplier, policyholder, or agent), The Corporation will not approve outside work where there is a likelihood that the employee's job performance with the Corporation will suffer.

> LWCC employees must carefully consider the demands that additional work activity will create before accepting outside

employment. Outside employment will not be considered an excuse for poor job performance, absenteeism, tardiness, leaving early, refusal to travel, or refusal to work overtime or different hours. If outside work activity causes or contributes to job-related problems at the Corporation, the employee will be asked to discontinue the outside employment, and the employee may be subject to the normal disciplinary procedures dealing with the resulting job-related problem(s).

(Sherman Dep., Ex. 4, Doc. 10-2 at 68.) Likewise, Defendants produce the Unethical Behavior

Policy:

### FRAUDULENT AND UNETHICAL BEHAVIOR POLICY
### AND
### ETHICS AND FRAUD HOTLINE

The Corporation will establish an environment that will promote proper, effective, and efficient use of company resources and property. It is the policy of the corporation to investigate any reported suspected unethical, dishonest, and/or fraudulent behavior, including reports regarding accounting, Internal controls, auditing matters or misuse of company resources or property. Any individual found to have engaged in fraudulent or related misconduct, as defined in this policy, is subject to disciplinary action, which may include dismissal, as well as prosecution by appropriate law enforcement authorities.

It is the policy of the Corporation to maintain through an outside vendor an Ethics & Fraud Hotline designed to allow employees to report any fraudulent or inappropriate activities. Employees are not to initiate investigations on their own and should not confront an individual suspected of fraud or inappropriate activities directly. Anyone with a reasonable basis for believing fraudulent or inappropriate activities have occurred should call the Ethics & Fraud Hotline, which is a completely confidential service. The number for the Ethics & Fraud Hotline is [omitted].

Fraud and other inappropriate activities generally involve a willful or deliberate act or failure to act with the intention of obtaining an unauthorized benefit. Such acts include, but are not limited to:
• Making or altering documents or computer files with the intent to defraud
• Purposely inaccurate financial reporting
• Misappropriation or misuse of corporate resources, such as funds or other assets

11

> • Improper handling or reporting of cash transactions
> • Authorizing or receiving compensation for goods not received or services not performed

(Sherman Dep., Ex. 5, Doc. 10-2 at 69.)

Further, McGhee, Rickards, and Bourg attest that after the incident in the conference room, they conducted an investigation and determined that Sherman was actively working on her rental properties without permission to engage in outside work, as required by LWCC's Outside Employment Policy. (McGhee Decl. ¶ 11, Doc. 10-3; Bourg Decl. ¶ 9, Doc. 10-4; Rickards Decl. ¶ 8, Doc. 10-5.) According to Bourg, Bourg and Rickards spoke with Plaintiff on the day after the incident, and she admitted she had several rental properties and was actively working on them. (Bourg Decl. ¶ 8, Doc. 10-4.) Plaintiff also confirmed that she never made a written request nor obtained written permission from the department manager or Human Resources to work on her personal property, which they say violated this policy. (*Id.*)

They also say they determined she violated the Unethical Behavior Policy by misusing corporate resources for her personal business. (*Id.*) Rickards testified that they searched her computer and found (1) that she had listed seven rental properties on her 2021 tax return, and (2) that there were other documents on her computer reflecting her work on her rental properties, including (a) numerous emails to and from her LWCC email account and the Louisiana Housing Corporation regarding grants she was seeking for her rental property; (b) letters and other correspondence concerning her grant applications; (c) quotes for demolition and restoration work; (d) a calendar invite for the zoom meeting with the Louisiana Housing Corporation; and (e) other documents. (Rickards Decl. ¶ 7, Doc. 10-5.) All three LWCC Veeps aver that they decided to terminate Sherman based on these findings. (McGhee Decl. ¶ 11, Doc. 10-3; Bourg Decl. ¶ 9, Doc. 10-4; Rickards Decl. ¶ 8, Doc. 10-5.)

Plaintiff complains about the absence of contemporaneous documentation, but the record does not support this position. Specifically, Sherman testified that she met with McGhee the day after the incident, and McGhee told her that LWCC was "strongly leaning towards termination because [Plaintiff] had Emails with signature lines on it, and [she] did not report [her] investment property." (Sherman Dep. 79, Doc. 22-1.) The termination letter likewise said that it was a "follow up to [their] conversation" on June 9, 2022, regarding [her] employment with LWCC." (Sherman Dep., Ex. 19, Doc. 22-1.) Thus, contrary to Plaintiff's position, Defendant has brought forward legitimate, non-discriminatory reasons for the termination.

### 2. *Pretext*

#### a. Applicable Law

"Accordingly, at this stage, 'the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [becomes] discrimination *vel non*." *Stennett v. Tupelo Pub. Sch. Dist.*, 619 F. App'x 310, 315–16 (5th Cir. 2015) (per curiam) (citing *Reeves*, 530 U.S. at 142–43 (internal quotation marks and citation omitted)). "This burden ultimately rests on the plaintiff." *Id.* (citing *Reeves*, 530 U.S. at 143). "And in attempting to satisfy this burden, the plaintiff—once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision—must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Reeves*, 530 U.S. at 143 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993))). "That is, the plaintiff may attempt to establish that [s]he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Reeves*, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 256)).

"Critically, at the summary-judgment stage, [the Court's] ultimate question is not whether [Plaintiff] has 'proven' or 'established' that [Defendant's] proffered reasons are pretextual but rather only whether she has produced sufficient evidence to create a 'genuine issue' as to whether those reasons are pretextual." *Id.* at 315–16 (citing *Jackson v. Cal–Western Packaging, Corp.,* 602 F.3d 374, 378 (5th Cir. 2010); *Bright v. GB Bioscience Inc.,* 305 F. App'x 197, 203 (5th Cir. 2008) ("While the ultimate burden of proving discrimination remains with the plaintiff throughout the case, within the context of a summary judgment motion, 'the question is not whether the plaintiff *proves* pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext.'" (quoting *Amburgey v. Corhart Refractories Corp.,* 936 F.2d 805, 813 (5th Cir. 1991)))).

"[T]he Supreme Court has clarified that 'although the presumption of discrimination drops out of the picture once the defendant meets its burden of production . . . the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" *Id.* at 316 (quoting *Reeves*, 530 U.S. at 143 (internal quotation marks and citations omitted)). The Supreme Court has stated:

> In saying that the presumption drops from the case, we do not imply that the trier of fact no longer may consider evidence previously introduced by the plaintiff to establish a prima facie case. A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual. *Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.*

*Id.* (quoting *Burdine*, 450 U.S. at 255 n.10 (emphasis added)).

14

"Further, the Court in *Reeves* also emphasized that lower courts must 'review the record as a whole' at the summary-judgment stage in evaluating whether evidence supports a finding of pretext." *Id.* (quoting *Reeves*, 530 U.S. at 151); *see also Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 404 (5th Cir. 1999) ("Since this [Title VII] claim reached the pretext stage, the issue on appeal is whether the totality of the evidence, including the evidence raised at the prima facie case and pretext stages, raises a genuine issue of material fact as to whether [defendant] fired [plaintiff] because of her race."); *Danville v. Regional Lab Corp.,* 292 F.3d 1246, 1250 (10th Cir. 2002) ("When assessing whether plaintiff has made an appropriate showing of pretext, we must consider the evidence as a whole.")). "Likewise, the Supreme Court has made clear that, in order to create a genuine issue as to pretext, [Plaintiff] 'is not limited to presenting evidence of a certain type.'" *Id.* (quoting *Patterson v. McLean Credit Union,* 491 U.S. 164, 187 (1989), *superseded on other grounds by statute,* Civil Rights Act of 1991, 42 U.S.C. § 1981). "Indeed, in *Patterson,* the Supreme Court found that the district court had committed reversible error by *requiring* the plaintiff to show that she was better qualified than the successful applicant in order to prove pretext." *Id.* (citing *Patterson*, 491 U.S. at 187–89). "In so holding, the Supreme Court explained that '[t]he evidence [a plaintiff] can present in an attempt to establish that [an employer's] stated reasons are pretextual may take a variety of forms.'" *Id.* (quoting Patterson, 491 U.S. at 187).

"Accordingly, the [Supreme Court] emphasized that a plaintiff 'may not be forced to pursue any particular means of demonstrating that [an employer's] stated reasons are pretextual.'" *Id.* (quoting *Patterson*, 491 U.S. at 188). The Fifth Circuit has "recognized that one method of creating a genuine issue as to pretext is by presenting evidence showing disparate treatment or that the employer's proffered explanation is false or unworthy of credence." *Id.* (citing *Sanders v. Anadarko Petro. Corp.,* 108 F. App'x 139, 143 (5th Cir. 2004); *see also Reeves,* 530 U.S. at 147

("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."); *Danville,* 292 F.3d at 1250 ("Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence that the employer did not act for the asserted non-discriminatory reasons." (internal quotation marks and citation omitted))); *see also Lambert*, 2021 WL 6803718, at *8 ("according to the Fifth Circuit, Lambert can establish pretext by presenting evidence of: (1) disparate treatment; (2) inaccuracy of the reasons or inconsistent explanations given by the City for its employment decisions at different times; (3) Lambert's being clearly better qualified than Barnes; or (4) the City's failure to follow its own policies *if* Lambert was treated differently than other employees outside his protected class." (citing *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 346 (5th Cir. 2007); *Hypolite v. City of Houston, Tex.*, 493 F. App'x 597, 605 (5th Cir. 2012)); *Williams v. Texas Facilities Comm'n*, No. 17-689, 2019 WL 2774333, at *4 (W.D. Tex. July 1, 2019) ("One way to establish pretext is to show that an employer failed to follow its own policies and procedures, did not discipline other employees who committed similar misconduct, or failed to document the termination process." (citing, inter alia, *Smith v. Xerox Corp.*, 371 F. App'x 514, 520 (5th Cir. 2010) (failure to follow company policies); *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (failure to discipline other similarly situated employees)).

### b. Analysis

Having carefully considered the matter, the Court finds that, when construing the evidence in a light most favorable to Plaintiff and drawing reasonable inferences in her favor, a reasonable jury could conclude that Defendant's stated reasons for termination were a pretext for racial

discrimination. In short, genuine issues of material fact preclude summary judgment in Defendant's favor.

At the outset, the plain language of the Outside Employment Policy reflects questions of fact. For example, the policy states that it does not encourage employees "to hold other jobs" and requires approval "from the human resources department" for those "seeking outside employment." (Sherman Dep., Ex. 4, Doc. 10-2.) One seeking approval must provide the name of, inter alia, "the prospective employer. . ." (*Id.*) The policy goes on to specifically address how LWCC will not give approval for "a possible conflict of interest" such as "working for a competitor or someone with whom the Corporation has a contractual relationship. . . ." (*Id.*) Construing this language in a light most favorable to Plaintiff, with reasonable inferences drawn in her favor, a reasonable factfinder could conclude that this policy does not apply to employees like Plaintiff who were managing their own investment property.

Putting that aside, Plaintiff submits evidence from other employees reflecting how the Outside Employment Policy was understood and enforced, and this supports her position her termination was pretextual. Specifically, while Chantel Johnson, a Black female, worked at LWCC, she attended school and received a real estate license to assist her mother with her real estate business. (Johnson Decl. ¶¶ 5, 22, Doc. 19-3.) She received a copy of the written secondary employment policy, and her understanding of it was that it applied to employment such as working for a LWCC competitor. (*Id.* ¶¶ 6, 14.) She said that many LWCC employees had part-time jobs, and she was not aware of any of them reporting jobs as secondary employment when those jobs did not conflict with LWCC. (*Id.* ¶ 8.) Johnson mentioned to her manager, Darrel Fletcher, that she received a real estate license, and Fletcher told Johnson she needed to report it to HR. (*Id.* ¶ 10.) Eventually Johnson had to discuss the matter with her supervisor, Bourg, who later told

Johnson that Johnson had to choose between LWCC and real estate. (*Id.* ¶¶ 11–12.) Johnson thought this was incorrect, since she was a fulltime student while at LWCC, it was known, and it was never a problem. (*Id.* ¶ 12.) Bourg discussed the matter with LWCC's attorney, who called Johnson and said the real estate work was approved. (*Id.*) Later, Johnson worked on a closing, and she posted it on social media. (*Id.* ¶ 13.) Bourg saw it and questioned Johnson as to whether she had taken leave. (*Id.*) Johnson said she had taken paid time off for it, and nothing more was said. (*Id.* ¶ 14.) Johnson said she felt as though she was treated differently than other coworkers who had side business, and she had never heard of another person that had to get approval like she did. (*Id.* ¶ 15.)

Likewise, Stephen Cherry was an underwriter at LWCC. (Cherry Decl. ¶ 3, Doc. 19-5.) His wife ran a photography business, and he helped on the weekends. (*Id.*¶ 6.) The LLC listed both as members. (*Id.*) In 2022, his manager indicated that Cherry's second job was not an issue, and he was never instructed to formally report his photography business at LWCC. (*Id.* ¶¶ 7–8.) Cherry also stated that he was shown the secondary employment policy during one of the company's Friday meetings. (*Id.* ¶ 11.) Cherry also noted that LWCC had a room called the telephone booth for personal calls, and making personal calls during breaks was not against the rules. (*Id.* ¶ 17.)

Debra Taylor retired from LWCC in June of 2019 and worked there as a Director of Human Resources, though not while Sherman was employed. (Taylor Decl. ¶ 3–4, Doc. 19-6.) Taylor recalled the secondary employment policy but did not remember it ever including ownership or management of investment property. (*Id.* ¶ 5.) During her time at LWCC, she would not have considered investment property to be applicable to this policy, and she did not recall anyone reporting investment property to HR as secondary employment. (*Id.* ¶¶ 5–6.) She said that the secondary employment policy focused on working for another company that could be in conflict

with LWCC or working for another employer where a workplace injury may come into question as to whether it happened at the other employer's location, or a situation where a second job's work hours may cause conflict with the LWCC primary job. (*Id.* ¶ 8.)

Laurie Gautreaux, a White female, worked in the Information Technology Department for 19 years until 2021. (Gautreaux Decl. ¶ 3, Doc. 19-7.) She testified that she owned rental property and "was never informed that [she] needed to report this as second employment, as it is not a second job." (*Id.* ¶ 6.) She testified that "It was understood that the secondary employment policy related to working for other employers and potential conflicts." (*Id.* ¶ 10.)

Additionally, these co-employees testified about how Gautreaux, a white female, was also engaged in outside employment during work hours without a problem from LWCC. Specifically, Johnson attests, "Laurie Gautreaux, a white female, sold Avon at LWCC during work hours and while on breaks. Gautreaux used the LWCC email for her Avon sales. Her Avon activities were widely known and utilized within LWCC." (Johnson Decl. ¶ 16, Doc. 19-3.) Cherry said he was "aware that Laurie Gautreaux sold Avon products at LWCC, distributing brochures to both women and men at LWCC at work." (Cherry Decl. ¶ 9, Doc. 19-5.) Former HR Director Taylor did not recall if Gautreaux reported her Avon business as secondary employment, but she was fully aware of that secondary employment. (Taylor Decl. ¶ 9, Doc. 19-6.) Gautreaux herself testified, "I sold Avon products before 2017 and was never told I had to report that as secondary employment. Management informed me that I could not post flyers at LWCC but could pass out brochures." (Gautreaux Decl. ¶ 7, Doc. 19-7.) Gautreaux also said, "LWCC staff regularly emailed me orders using the LWCC email system." (*Id.* ¶ 8.)

These witnesses submit further evidence calling into question Defendant's stated reasons for the termination. Johnson said she did not recall there being a written email policy, and she was

not aware of any other employee other than Plaintiff who was terminated for using LWCC email for personal business or failing to report secondary employment. (Johnson Decl. ¶¶ 17–18, Doc. 19-3.) Moreover, only Sherman and Johnson were questioned about secondary employment. (*Id.* ¶ 19.) Johnson states that LWCC treated her and Sherman differently and unfairly because they were Black females. (*Id.* ¶ 22.) Cherry likewise said that he did not know of anyone else being terminated for secondary employment. (Cherry Decl. ¶ 12, Doc. 19-5.) He was unsure if there was a written policy about using emails for personal purposes, but he believed that everyone used LWCC email for personal purposes occasionally, as he did, and he was not aware of anyone being terminated for doing so. (*Id.* ¶¶ 13–15.) Cherry said "[i]t was unfair that Sherman was terminated for secondary employment, as everyone knew she and her husband had rental properties, which she acquired after their divorce." (*Id.* ¶ 25.) Gautreaux testified that, though she was aware of the policy barring personal use of company email, she also was aware that employees used the email for personal use. (Gautreaux Decl. ¶ 11, Doc. 19-7.)

Plaintiff's testimony is consistent with that of the above employees. She attests, "It was common knowledge that other LWCC employees conducted personal business while also employed by LWCC. Laurie Gautreaux sold Avon products at LWCC on a regular basis. Chantel Johnson was a real estate agent during her off hours. Kyle Rickards bought, sold and flipped homes." (Sherman Decl. ¶ 15, Doc. 19-8.) "Laurie Gautreaux, a white female, did not report her Avon business as outside employment and was not terminated." (*Id.* ¶ 16.)

Defendant complains that Plaintiff lacks a basis for knowledge for these statements, but Plaintiff clearly states that it was "common knowledge," which she would have learned from her long-time employment with LWCC. Plaintiff likewise declares, "I knew that it was normal for employees of LWCC to use email for incidental personal use." (*Id.* ¶ 19.) Plaintiff also notes how

20

Gautreaux, a white female, "used LWCC email to sell Avon products and many LWCC employees responded via LWCC email to Gautreaux via LWCC email for these purchases." (*Id.* ¶ 21.) Gautreaux also emailed her Avon orders on the LWCC email system. (*Id.* ¶ 22.) Again, Plaintiff knew of no other employees who were terminated for violating this policy. (*Id.* ¶ 21.)

All of the above evidence adds further significance to some of the key details leading to Plaintiff's termination. Sherman declares under oath that she "properly reserved the conference room" and that she was "on lunch break." (*Id.* ¶ 9.) She further states that, though Bourg said that reserving the conference room would make it unavailable for others, "there [were] at least 4 conference rooms on each floor of the 8-story building." (*Id.* ¶ 10.) She states it was "well known at LWCC" that she had investment properties and that she worked on these properties (including that she "was attempting to obtain grants to accomplish renovations so that they could be sold or rented"). (*Id.* ¶ 12.)[2] Plaintiff said she did this work "[o]n her own time and on lunch breaks" and

---

[2] The Court agrees with Plaintiff that this testimony supplements her deposition testimony rather than contradicting it. Defendant says this conflicts with Plaintiff's deposition testimony "in which the only individual plaintiff indicated may have been aware of her ownership of investment properties was former LWCC employe Debra Taylor." (Doc. 22 (citing Sherman Dep. 178, Doc. 22-1).) But that's not exactly what was said: "Q. Did you, in fact, report to your employer that you had investment properties? A. Yes, they were aware of it. Q. And to whom? Well, who was aware of that? A. Debra Taylor. Q. And what was her position? A. She was the Human Resources manager." (Sherman Dep. 178, Doc. 22-1.) A reasonable inference from this testimony, when read as a whole, is that LWCC knew of her investment properties because she reported it to the Human Resources manager, who then, as part of her job duties, relayed the information to the appropriate channels. This is particularly true in light of the law Plaintiff highlights in her surreply:

> [N]ot every discrepancy in an affidavit justifies disregarding it when evaluating summary judgment evidence. *See* [*Winzer v. Kaufman Cty.*, 916 F.3d 464, 472 (5th Cir. 2019)]. Instead, the bar for applying the [shame-affidavit] doctrine is a high one, typically requiring affidavit testimony that is "inherently inconsistent" with prior testimony. *See id.*; *see also Clark v. Resistoflex Co., A Div. of Unidynamics Corp.*, 854 F.2d 762, 767 (5th Cir. 1988) (characterizing the sham-affidavit doctrine as "denying credence to an affidavit so markedly inconsistent with the affiant's prior deposition as to constitute an obvious sham"). An affidavit that "supplements rather than contradicts prior deposition testimony" falls outside the doctrine's ambit. [*S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996)]. In other words, the sham-affidavit doctrine is not applicable when discrepancies between an affidavit and other testimony can be reconciled such that the statements are not inherently inconsistent. *Winzer*, 916 F.3d at 472–73. Typically, then, "'[i]n light of the jury's role in resolving questions of credibility,

that the "time [she] spent on these activities was minimal and never conflicted with [her] work for LWCC." (*Id.* ¶ 12.)

Finally, all of this evidence must be seen in the context of Plaintiff's *prima facie* case, which remains relevant to the pretext analysis. *See Stennett*, 619 F. App'x at 316. Though Defendant assumes *arguendo* that this was met, Plaintiff submits in her declaration that, following her termination, she was replaced with her former supervisor, a white male. (Sherman Decl. ¶ 32, Doc. 19-8.) Thus, Plaintiff "was replaced by someone outside the protected class[,]" *Santos*, 2021 WL 1227875, at *15 (citations omitted), and this further supports Plaintiff's arguments for pretext.

The Court recognizes, as Defendant highlights, that the key question is whether "the 'real reason' for her termination was discrimination and not her violation of the [ ] polic[ies]." *Holmes*, 2023 WL 2823897, at *3 (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002)). A plaintiff cannot prove pretext merely by showing that the employer reached "the wrong result." *See id.* (citing *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("[E]vidence that the employer's investigation merely came to an incorrect conclusion does not establish a [discriminatory] motivation behind an adverse employment decision.")). "The pretext inquiry is directed at whether the employer's explanation is 'true,' not whether it is 'wise, fair or correct.'" *Battle v. United Parcel Serv., Inc.*, No. 10-0361, 2011 WL 8202606, at *9 (W.D. Tex. Dec. 21, 2011) (quoting *Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830, 837 (8th Cir. 2002)).

---

a district court should not reject the content of an affidavit even if it is at odds with statements made' earlier." *Id.* at 472 (quoting [*Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 893 (5th Cir. 1980)]).

*Seigler v. Wal-Mart Stores Tex., L.L.C.,* 30 F.4th 472, 477 (5th Cir. 2022). The inconsistency highlighted by Defendant falls well short of the high bar for excluding it under the sham-affidavit doctrine.

But, "[c]ritically, at the summary-judgment stage, [the Court's] ultimate question is not whether [Plaintiff] has 'proven' or 'established' that [Defendant's] proffered reasons are pretextual but rather only whether she has produced sufficient evidence to create a 'genuine issue' as to whether those reasons are pretextual." *Stennett*, 619 F. App'x at 315. And, again, "one method of creating a genuine issue as to pretext is by presenting evidence showing disparate treatment or that the employer's proffered explanation is false or unworthy of credence." *Id.* at 317 (citations omitted). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence that the employer did not act for the asserted non-discriminatory reasons." *Id.* (quoting *Danville*, 292 F.3d at 1250). Plaintiff "can establish pretext by presenting evidence of," inter alia, "disparate treatment; [ ] inaccuracy of the reasons or inconsistent explanations given . . . for [the] employment decisions[;]" and LWCC's "failure to follow its own policies *if* [Plaintiff] was treated differently than other employes outside [her] protected class." *See Lambert*, 2021 WL 6803718, at *8 (citations omitted); *see also Williams*, 2019 WL 2774333, at *4 ("One way to establish pretext is to show that an employer failed to follow its own policies and procedures[] [or] did not discipline other employees who committed similar misconduct . . . ." (citations omitted)).

Considering all of this evidence highlighted above, the Court easily concludes that there are a host of questions of fact precluding summary judgment on the question of pretext, including the meaning of the policies at issue and how those policies were generally understood, applied, and enforced in practice; whether they applied to investment property in any way; whether LWCC had knowledge of Plaintiff's activities with the investment property; what employees were allowed to do during breaks, and whether Plaintiff engaged in work during same; and whether any other

employee had ever been terminated for violating either policy. Defendant's nitpicking of the co-employee declarations and objections to Plaintiff's own testimony are, ultimately, fodder for cross-examination at trial.

In sum, when construing all of the evidence in the light most favorable to Plaintiff with reasonable inferences drawn in her favor, a reasonable jury could conclude that Sherman's alleged violation of the two policies was not the real reason for her termination but rather a discriminatory animus was. As a result, LWCC's motion will be denied. *See Williams*, 2019 WL 2774333, at *5 (recommending denial of summary judgment on question of pretext, where proffered reasons for termination included violation of outside employment policy and misuse of company property, because, inter alia, (1) there was "evidence that various [ ] employees [of Defendant] used [its] equipment for personal use;" (2) "two other employees . . . both had outside jobs without their forms being filled out and their outside employment pre-approved;" and (3) these other employees were not disciplined); *Battle*, 2011 WL 8202606, at *14 ("Such testimony indicates that a reasonable jury could find that the FlexBen Plan policy was not commonly applied to employee's in Plaintiff's position. If this is the case, it would support Plaintiff's argument that Defendant's use of the FlexBen Plan to terminate Plaintiff was pretext for discrimination."); *Wooten v. Fed. Exp. Corp.*, No. 04-1196, 2007 WL 63609, at *13 (N.D. Tex. Jan. 9, 2007) (denying summary judgment on discriminatory termination claim under Title VII and § 1981 in part because plaintiffs "adduce[d] evidence that, *inter alia*, the alleged misconduct for which they were discharged was in fact 'common practice' at FedEx, and that other employees engaged in nearly identical misconduct but were not disciplined or terminated as a result.").

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Motion for Summary Judgment* (Doc. 10) filed by the Louisiana Workers' Compensation Corporation is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>February 4, 2025</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**